*Marlon Koushall v. State of Maryland*, No. 13, September Term, 2021. Opinion by Hotten, J.

**CRIMINAL PROCEDURE – SUFFICIENCY OF EVIDENCE – USE OF FORCE**

When reviewing the sufficiency of evidence in a bench trial, this Court asks, "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Grimm v. State*, 447 Md. 482, 494–95, 135 A.3d 844, 851–52 (2016) (citation omitted). Petitioner was convicted of second-degree assault and misconduct in office by the circuit court following a bench trial. After considering witness testimony and watching security and body camera footage, the circuit court found that Petitioner did not use reasonable force under the circumstances in effecting an arrest. The Court of Appeals held that there was legally sufficient evidence to sustain both convictions, because after viewing the evidence in a light most favorable to the State, a rational trier of fact could have found that witness testimony and security camera footage depicting Petitioner strike another individual in the head approximately five seconds after ordering the individual to "back up", was not consistent with the reasonably necessary use of force under the circumstances.

**CRIMINAL PROCEDURE – SENTENCING – MERGER**

"Maryland recognizes three grounds for merging a defendant's convictions: (1) the required evidence test; (2) the rule of lenity; and (3) the principle of fundamental fairness." *Carroll v. State*, 428 Md. 679, 693–94, 53 A.3d 1159, 1167 (2012) (citation and quotation marks omitted). The Court of Appeals held that none of these grounds warranted merger of second-degree assault and misconduct in office for sentencing purposes. The convictions did not merge under the required evidence test because second-degree assault and misconduct in office both contain at least one element of a crime not contained in the other. The rule of lenity did not apply because the General Assembly did not express an intent for the crime of second-degree assault to merge with the common law crime of misconduct in office for sentencing purposes. The Court did not address fundamental fairness because it was not raised by Petitioner.

Circuit Court for Baltimore City
Case No. 119038015
Argued: November 1, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 13

September Term, 2021

_____

MARLON KOUSHALL

v.

STATE OF MARYLAND

_____

Getty, C.J.,
McDonald,
Hotten,
Booth,
Biran,
Raker, Irma S. (Senior Judge,
Specially Assigned),
Wilner, Alan M. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Hotten, J.

_____

Filed: February 3, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Members of law enforcement are public officers privileged to use force when reasonably necessary under the circumstances to protect life and preserve the peace. This privilege is lost when a member of law enforcement uses excessive force—that is force greater than is reasonably necessary under the circumstances. A member of law enforcement who uses excessive force may incur criminal and civil liability. We are asked to determine whether there was sufficient evidence to convict a member of law enforcement of second-degree assault and misconduct in office for striking another in the head preceding an arrest, and if so, whether the convictions should merge for sentencing purposes.

Following a bench trial, officer Marlon Koushall[1] ("Petitioner") of the Baltimore City Police Department ("BCPD") was convicted of second-degree assault and misconduct in office. Both convictions arose from the same underlying incident in which Petitioner appeared to punch an unarmed subject in the head within seconds of initial approach. The Circuit Court for Baltimore City sentenced Petitioner to six years' imprisonment, all suspended but one day of time served, for the second-degree assault conviction with three years of probation with the first year supervised, and 100 hours of community service. The circuit court also sentenced Petitioner to ten years' imprisonment for the misconduct in office conviction, all suspended but one day of time served consecutive to the second-degree assault conviction, with three years of probation with the first year supervised.

---

[1] At the time of trial, Petitioner was suspended with pay.

Petitioner appealed the circuit court's finding of legal sufficiency of evidence to support the second-degree assault and misconduct in office convictions to the Court of Special Appeals. In the alternative, Petitioner argued that the two convictions should merge for sentencing purposes because the same act—striking another in the head during the commission of an arrest—was the factual predicate for both convictions. The Court of Special Appeals rejected Petitioner's arguments and affirmed the circuit court.

We granted *certiorari* to address the following questions:

1. Where a conviction for misconduct in office is based on the corrupt doing of an unlawful act, does the conviction for the "unlawful act" merge with the conviction for misconduct in office for sentencing purposes?

2. Whether there was sufficient evidence to support Petitioner's convictions for assault in the second degree and misconduct in office?

We answer the first question in the negative, the second question in the affirmative, and shall affirm the judgment of the Court of Special Appeals.

## FACTS AND PROCEDURAL BACKGROUND

### Underlying Incident

On August 25, 2018, Henrietta Middleton ("Sgt. Middleton"), an off-duty sergeant for BCPD attended a surprise party[2] to celebrate the marriage of Wanda Johnson, an off-duty detective for BCPD. The party consisted of approximately ten women. The group began consuming alcohol at brunch. By 10 p.m., and after patronizing two other

---

[2] The record refers to the surprise party as both a "bridal shower" and a "bachelorette party[.]" To avoid confusion and for consistency, we refer to the gathering as "the party."

2

establishments, the party eventually arrived at Norma Jean's, a strip club in an area of downtown Baltimore known as "the Block."[3]

The group had reserved a private table within "the VIP Section." An unaffiliated patron, Jane Stancil, attempted to sit with the group at the reserved table. Ms. Stancil refused to leave, and a "melee" erupted between several members of the group, Ms. Stancil, and a friend of Ms. Stancil. Security escorted Ms. Stancil out of Norma Jean's, and the group decided to leave a few minutes later.

The group eventually left Norma Jean's around 1:14 a.m., August 26, 2018. Ms. Stancil approached the group outside the club and an argument ensued. Officer Anthony Pujols, a beat officer on the scene, took action when the argument turned physical. Officer Pujols called for back-up[4] while attempting to separate members of the group from Ms. Stancil, who according to Officer Pujols, "was being the more aggressive" individual.

Petitioner, at the time an on-duty sergeant and patrol supervisor for the midnight shift in the Central District, responded to the call. Around the same time, Sgt. Middleton confronted Ms. Stancil. Sgt. Middleton believed that Ms. Stancil had spit at her, and with her palms extended and facing up, asked Ms. Stancil, "[w]hat are you spitting for?" Officer Pujols testified that he observed Sgt. Middleton confront Ms. Stancil, but he was not

---

[3] "'[T]he Block' (for the uninitiated . . . is an 'adult entertainment' strip of several blocks along East Baltimore Street in Baltimore City)[.]" *Lucado v. State*, 40 Md. App. 25, 27, 389 A.2d 398, 399 (1978).

[4] Officer Pujols testified that he requested additional units as a matter of de-escalation protocol.

concerned with "their threat level . . . because [he'd] been, since the beginning . . . with them . . . and [felt] kind of comfortable. . . . [A]t that point[,] . . . I was okay living with it."

When Petitioner arrived at the scene around 1:30 a.m., he exited the police vehicle and shouted at Sgt. Middleton to "back up." Before Sgt. Middleton could respond, Petitioner pushed Sgt. Middleton backwards. According to security camera footage, Petitioner struck Sgt. Middleton on the left side of the face[5] less than five seconds after his initial approach.

Sgt. Middleton attempted to flee, but Petitioner grabbed her hair and wrestled her to the ground. Officer Pujols and Ms. Blake intervened and separated Petitioner and Sgt. Middleton. Officer Pujols "got on [Petitioner's] back[]" because he feared Petitioner would strike Sgt. Middleton again. Petitioner arrested Sgt. Middleton.

BCPD cited Sgt. Middleton for disorderly conduct, failure to obey a lawful order, assault on a police officer, and resisting arrest. After reviewing the evidence, the State dropped the charges against Sgt. Middleton and indicted Petitioner for second-degree assault and misconduct in office.

### The Trial

Petitioner elected to proceed with a bench trial, which occurred in September and October 2019 in the Circuit Court for Baltimore City. The State called the three women

---

[5] The camera footage did not conclusively indicate how Petitioner struck Sgt. Middleton in the head, but the State presented evidence that Petitioner punched Sgt. Middleton in the face with a closed fist. Sgt. Middleton testified that she was hit "in the left side of [her] face, ear area[]" with a "closed fist." Nicole Blake, a private security guard, testified that Petitioner "pulled back his fist all the way and then hit [Sgt. Middleton]."

4

from the party who were at the time off-duty detectives for the BCPD. Sgt. Middleton was assigned to Special Investigation Response Team ("SIRT"), which is "a unit under the umbrella of Internal Affairs[]" that "specifically handle[s] . . . in custody deaths [and] vehicle pursuits[.] . . ." Sgt. Middleton testified that after she approached Ms. Stancil, Petitioner "told [her] to back up[, and b]efore [she] can react to the statement given to [her], [she's] pushed and then [she's] hit in the left side area of my face, ear area." According to Sgt. Middleton, her hands were "[o]ut by [her] side."

Detective Dominique Wiggins, another member of the party, observed the incident and testified that Sgt. Middleton had not behaved in a way that warranted a physical response from Petitioner. According to Detective Wiggins, Petitioner made no effort to de-escalate and was "extremely aggressive" towards Sgt. Middleton. Detective Wiggins also testified that Petitioner acted as if he had a "vendetta" against Sgt. Middleton.

Detective Wanda Johnson provided a similar recollection of the event. Her husband, Marcus Johnson, another BCPD officer who was on-duty and assigned to another district, arrived at some point during the altercation and escorted her away to the end of the block. Despite the distance, Detective Johnson testified that she could still see and hear the incident. Detective Johnson observed Petitioner walking towards the crowd in the middle of the street. Meanwhile, according to Detective Johnson, Sgt. Middleton was walking on the sidewalk attempting to get the attention of one of her friends. Detective Johnson testified that Petitioner "turned around . . . [and] pushed [Sgt. Middleton]." Detective Johnson did not hear Petitioner say anything to Sgt. Middleton, but witnessed

5

Sgt. Middleton "thr[o]w up her hands and [say], 'What the F, I'm a sergeant.' And then [Petitioner] struck her face again."

Ms. Blake testified that she intervened because she feared for the safety of Sgt. Middleton. According to Ms. Blake, Petitioner "pulled back his fist all the way and then hit [Sgt. Middleton][]" with "full force, like he wanted to hit a man." The State also called Officer Pujols, who testified that he tried to pull Petitioner away from Sgt. Middleton to prevent the incident from getting out of hand.[6] At various points throughout the testimony of the State's witnesses, the State played video footage and still frames of the incident from multiple sources and angles, including inside and outside of Norma Jean's, Baltimore City CitiWatch surveillance video footage,[7] and BCPD body cameras.

Petitioner called three BCPD officers. Officer Justin Vitek, who responded to the scene shortly after Petitioner, testified about the aftermath of the altercation. Officer Yolanda Nelson watched the security footage of the incident and advised Petitioner to press charges against Sgt. Middleton. Lieutenant Jason Yerg testified about citations issued against Sgt. Middleton, although those citations were not formally filed with the circuit court.

---

[6] BCPD officers "have a <u>duty</u> to intercede to prevent the use of excessive force by another member toward any person." BCPD Policy 1115, *Use of Force* at 1 (Mar. 2, 2018) ("Policy 1115"). As of November 24, 2019, Policy 1115 was updated and uses different language than the policy in effect at the time of the arrest.

[7] "In 2005, [BCPD] created the ground-based surveillance program called CitiWatch. This program . . . comprises a network of . . . CCTV cameras located throughout the city that collect video used to respond to, and investigate[] crimes. . . ." Police Foundation, *A Review of the Baltimore Police Department's Use of Persistent Surveillance* 7 (2017), archived at https://perma.cc/8HX2-GFGQ.

Petitioner also testified on his own behalf. In his opinion, his response to the aggression was appropriate. The defense played body camera footage of Petitioner speaking to another BCPD officer, Sergeant Antwann Davis, following the incident. During the recording, Petitioner stated that Sgt. Middleton aggressively approached him in a "fighting stance[.]" According to Petitioner, "[Sgt. Middeton] shoved [him.]" Petitioner issued a verbal warning and "struck her[]" after she failed to comply with his order.

Petitioner offered the expert testimony of Dr. Charles J. Key, who specialized in police training and police use of force. Dr. Key opined that an officer may use hand and foot strikes when a subject displays "active aggression[,]" which Dr. Key defined as "an attempt and/or the officer reasonably believes there is an imminent threat of an attack against him and/or actual attack where the person attempts to strike or actually strikes." When an officer encounters active aggression, Dr. Key testified that an officer may use "strikes, batons, electronic controlled weapons, UCW tasers, pepper spray and/or a myriad of other use of force options in order to respond to that imminent threat of attack."

According to the assessment of Dr. Key, Sgt. Middleton displayed "[a]ctive aggression resistance[]" based on video footage depicting Sgt. Middleton's "arms extended out, [and] testimony of [Petitioner] that she shoved him, which would constitute an actual assault. All of that and the failure to get back when told to by both [Officer] Pujols and [Petitioner]." Dr. Key opined that Petitioner responded appropriately under the circumstances and would have been justified under the circumstances to have used even greater force, including a taser or baton.

7

Petitioner admitted Policy 1115 into evidence that detailed the police use of force protocol at the time.  Policy 1115 provided in pertinent part:

**1.  Sanctity of Human Life.**  The policy of the Baltimore Police Department [] is to value and preserve human life in all situations.

**2.  Use of Force: Objectively Reasonable, Necessary, and Proportional.** Members shall use only the force objectively reasonable, necessary, and proportional to effectively and safely resolve an incident, while protecting the lives of the member or others.  The B[C]PD places restrictions on use of force that go beyond restrictions set forth by law.

**3.  De-Escalation**.  Members shall de-escalate as soon as possible and appropriate.  Members may be justified in using force at one moment, but not justified in using force several seconds later due to the changing dynamics of a situation.

3.1.  Members shall continually assess the situation and changing circumstances, and modulate their use of force appropriately.

3.2.  When possible, members should "slow down" the situation and re-assess how they can achieve the most peaceful outcome.

\*\*\*

Sworn members are granted the authority to use force when necessary to accomplish lawful ends. . . .  Where members are justified in the use of force, the utmost restraint should be exercised.  When practical, members should announce that force will be utilized prior to the application of such force.

Policy 1115 at 1–2.

Petitioner also admitted into evidence the BCPD "Use of Force Model" that served as a training tool for BCPD officers.  The model provided a "continuum of aggression of the subject" ranging from "compliant, passive resistance, active resistance, active aggression,[8] to aggravated aggression."  According to the "Use of Force Model", when a

---

[8] According to the BCPD's training module on defensive tactics, active aggression is associated with the following traits:

(continued . . .)

subject exhibits active aggression, an officer may use "professional presence, verbal command, arrest and control techniques, OC Spray/Chemical Agents, conducted electrical weapons, [or] hand/foot strikes."

Even when a subject displays active aggression, BCPD officers are urged to exercise caution and restraint before using force:

> Many officers feel that they have to do something. Feeling the need to do something may have drastic negative outcomes if there is no plan. During most situations, time is on the side of the officer. Take time to evaluate what is happening. Ask yourself some questions. Do I have all the information I need? Do I need additional resources? Does this situation have to be handled now? Are there any other options?

Defense Tactics at 14.

The "Use of Force Model" also informed BCPD officers that its description of appropriate use of force options should not be mistaken as a recommendation of use of force or a substitution of the judgment of a member of law enforcement when evaluating whether a particular use of force would be reasonably necessary under the circumstances:

---

(. . . continued)

> The subject attempts to apply or applies force to any person[,] attempts or threatens by an act or gesture, [attempts t]o apply force to another person, where that other person has a reasonable belief that the subject has the ability to carry out their threat. Examples include but not limited to: kicking[,] punching[,] posturing (aggressive body language-fists clenched-fists up)[,] verbal threat[.]

Sgt. Scott Swenson, *Baltimore Police Department Training Academy Defense Tactics Lesson Plan* ("Defense Tactics") at 11–12 (Jul. 20, 2016).

The circuit court found that Sgt. Middleton did not clench her fists or exhibit other behaviors suggestive of threatened or attempted use of force.

9

> This Model is not intended to serve as a justification for officer use of force nor does it prescribe specific response option(s) appropriate to a situation. The Model provides a valuable framework for understanding and articulating the events associated with an incident involving officer use of force.

*Id.* at 7.

Following the close of evidence, the circuit court found Petitioner guilty of second-degree assault and misconduct in office. The circuit court expressed doubts about the credibility of the fact witnesses, and relied on security camera footage in making its decision. The circuit court found that Petitioner's perception of Sgt. Middleton's active aggression was not reasonable and that he had "overreacted [to] everything." The circuit court did not find Sgt. Middleton to be an immediate threat to the officer's safety. The circuit court "was shocked[]" by the level of force depicted in the security video footage. The circuit court could not tell whether Petitioner struck Sgt. Middleton with an open hand or closed fist, but observed Petitioner "pull[] back his fist, and there was no doubt that he meant to not just get that person under control, but . . . had some intent to do more than get [Sgt.] Middleton under control."

The circuit court concluded that Petitioner's "actions were not reasonable given the totality of the circumstances. They went beyond what a reasonable officer would have done with his training and experience under the same circumstances."

The circuit court sentenced Petitioner to three years' imprisonment, all suspended except time served for the assault conviction, and six years' imprisonment, all suspended except time served for the misconduct conviction to run consecutively to the second-degree

assault conviction. The circuit court also sentenced Petitioner to three years of probation for each offense, with the first year supervised and 100 hours of community service.

Petitioner timely appealed to the Court of Special Appeals.

### *The Opinion of the Court of Special Appeals*

The Court of Special Appeals affirmed the judgment of the circuit court, concluding there was sufficient evidence to sustain both convictions, and holding that the second-degree assault conviction did not merge with the misconduct in office conviction for sentencing purposes. *Koushall v. State*, 249 Md. App. 717, 726, 246 A.3d 764, 770 (2021).[9]

The Court explained that it is the role of the circuit court, not the appellate court, to make factual findings, resolve conflicting evidence, and evaluate witness credibility. *Id.* at 729, 246 A.3d at 771 (citing *Spencer v. State*, 450 Md. 530, 548, 149 A.3d 610, 620 (2016)). The Court rejected Petitioner's argument that the expert testimony of Dr. Key should have received greater weight as an impermissible exercise of appellate review. *Id.*, 246 A.3d at 771 ("The purpose of our review is not to engage in a review of the record that would amount to, in essence, a retrial of the case.") (citation and quotation marks omitted).

The Court noted that the standard of review for legal sufficiency is "taking the facts in the light most favorable to the State, any reasonable factfinder could have come to the same conclusion that the court did[.]" *Id.* at 729–30, 246 A.3d at 771–72. The Court first

---

[9] The opinion was originally unpublished. The State moved pursuant to Md. Rules 8-601.5(b) and 8-431 to publish the opinion, which the Court of Special Appeals granted. The published opinion was filed February 26, 2021.

11

considered whether the evidence was legally sufficient to sustain the conviction for second-degree assault. Petitioner did not dispute that he intentionally struck Sgt. Middleton, so the issue of legal sufficiency turned on whether Petitioner's use of force was "reasonably necessary to discharge his official duties[.] . . ." *Id.* at 728, 246 A.3d at 771 (citations and footnote omitted).

The Court noted ample testimony in the record that corroborated the State's account that Petitioner displayed an unreasonable use of force. *See id.* at 730, 246 A.3d at 772. Sgt. Middleton testified that she was not acting aggressively, Petitioner made no effort to deescalate, and provided no opportunity to respond to a verbal direction before punching Sgt. Middleton in the head. *Id.*, 246 A.3d at 772. Other witnesses from the party corroborated Sgt. Middleton's account. Ms. Blake and Officer Pujols both intervened to stop Petitioner and prevent the incident from escalating further, even though Petitioner was at the time Officer Pujols' superior officer. *Id.*, 246 A.3d at 772. The security footage underscored Sgt. Middleton's version of events, which indicated that Petitioner approached Sgt. Middleton and punched her within five seconds. *Id.*, 246 A.3d at 772. The Court concluded there was sufficient evidence to affirm the conviction for second-degree assault. *Id.* at 732, 246 A.3d at 773.

The Court also found sufficient evidence to sustain the conviction for misconduct in office. *Id.* at 733, 246 A.3d at 774. Petitioner argued that because there was insufficient evidence to sustain the assault conviction, there must be insufficient evidence to sustain the misconduct in office conviction, which arose from the same facts. *Id.* at 733, 246 A.3d at 773. The Court rejected this argument after finding sufficient evidence to support the

12

assault conviction. The Court explained that an assault constitutes misconduct in office because it "is the doing of an act which a person ought not to do at all." *Id.* at 732, 246 A.3d at 773 (citation omitted).

Finally, the Court held that the crimes of second-degree assault and misconduct in office do not merge for sentencing purposes. *Id.* at 733, 246 A.3d at 774. The Court applied the "required evidence test" for merger, which the Court defined as: "Crime A is a lesser-included offense of Crime B where all of the elements of Crime A are included in Crime B, so that only Crime B contains a distinct element." *Id.* at 734, 246 A.3d at 774 (quoting *State v. Wilson*, 471 Md. 136, 178–79, 240 A.3d 1140, [1164] (2020)) (other citation omitted).

According to the Court, misconduct in office requires an act by a public official, which assault does not; and assault requires offensive touching, which misconduct in office does not. *Id.*, 246 A.3d at 774. The Court rejected Petitioner's argument that because assault may constitute malfeasance, and malfeasance may constitute corrupt conduct—an essential element of misconduct in office—the element of assault is an included element of misconduct in office. The Court noted that malfeasance is a "type of behavior" which can be used to prove the "corrupt behavior" element of misconduct in office. *Id.* at 735, 246 A.3d at 775. Even though the same facts can be used to prove corrupt behavior and second-degree assault, the Court did not find that second-degree assault was an element of misconduct in office. *Id.* at 736, 246 A.3d at 775.

The Court held that the circuit court correctly imposed separate sentences for second-degree assault and misconduct in office. *Id.* at 737, 246 A.3d at 776. The Court

13

did not consider whether the rule of lenity permitted merger because Petitioner did not raise the issue, and according to the Court, the rule of lenity would not be applicable because "[s]econd degree assault and misconduct in office are both common law crimes." *Id.* at 733 n.5, 246 A.3d at 774 n.5. The Court declined to address Petitioner's argument concerning fundamental fairness because it was not preserved for review. *Id.* at 737, 246 A.3d at 776.

Petitioner filed a petition for a writ of *certiorari*, which we granted. *Koushall v. State*, 474 Md. 718, 255 A.3d 1090 (2021).

## The Contentions of the Parties

Petitioner contends there is insufficient evidence for a rational factfinder to conclude that the use of a "hand strike" to the head was unreasonable under the circumstances. The circuit court acknowledged that "some level of force" was reasonable under the circumstances, but according to Petitioner, the State failed to present evidence establishing what level of force would have been unreasonable. Therefore, Petitioner asserts, "any conclusion that a reasonable officer . . . would not have acted the same amounts to pure speculation."

Petitioner argues that, while the State failed to present any evidence that a strike to the face was unreasonable under the circumstances, the expert testimony of Dr. Key and his explanation of BCPD's use of force policy established that the use of force was reasonable under the circumstances. According to Petitioner, Sgt. Middleton displayed "active aggression" by pushing Petitioner, squaring up and balling her fists. Dr. Key described these behaviors as "potential attack indicator[s,]" which permit BCPD officers

14

to respond with non-lethal force, including hand and foot strikes, baton hits, mace, or a taser. According to Petitioner, Sgt. Middleton must have exhibited aggression, otherwise Petitioner would not have been authorized to arrest her.

Petitioner contends that the circuit court disregarded this evidence of objectively reasonable use of force, and "without the aid of any expert opinion, legal authority or other evidence" found that a hand-strike was not reasonable under the circumstances. "Based on the *evidence* presented a trial, it would be impossible for a trier of fact to have found that Petitioner's actions were not legally justified." (Emphasis in original). Petitioner also contends that because there was insufficient evidence to sustain the assault conviction, there was insufficient evidence to sustain the misconduct in office conviction.

Assuming *arguendo* that this Court sustains both convictions, Petitioner argues the sentences should merge because the unlawful use of force element is an essential element of misconduct in office. According to Petitioner, misconduct in office may be satisfied by three alternative elements: malfeasance, misfeasance, or nonfeasance. Petitioner asserts that the alternative element of malfeasance was satisfied by the second-degree assault. Petitioner argues that because all elements of second-degree assault "are subsumed by the . . . malfeasance modality of misconduct in office . . . merger is required."

The State counters that Petitioner failed to apply the correct standard of review for sufficiency of evidence by primarily relying on evidence most favorable to the defense. The State contends that by applying the correct standard of review, which views the evidence in the light most favorable to the State, a reasonable factfinder could find Petitioner guilty of both offenses.

15

The State agrees with Petitioner that whether police use of force is legally justified depends on whether it was objectively reasonable under the circumstances. The State asserts that there was considerable evidence, particularly when viewed in the light most favorable to the State, that the use of force was objectively unreasonable. Camera footage and witnesses for the State did not depict Sgt. Middleton approaching Petitioner aggressively. Petitioner ordered Sgt. Middleton to back up and within five seconds, according to witness testimony for the State, punched Sgt. Middleton in the left side of the face with a closed fist. Other State witnesses testified that Petitioner a displayed gratuitous amount of force.

The State also asserts that there was sufficient evidence to determine whether the use of force was unreasonable. According to the State, use of force is a fact-intensive inquiry. The circuit court may have found the two-handed push reasonable under the circumstances, but according to the State, the circuit court was not precluded from finding unreasonable a closed fist punch that occurred seconds later. The State also rejects Petitioner's claim that because Petitioner and Dr. Key testified that his conduct conformed with Policy 1115, the use of force was objectively reasonable. According to the State, police department policy is not dispositive of whether use of force is reasonable. There was alternative evidence, through witness testimony and security footage, for the fact finder to determine that the use of force was unreasonable. The State also notes that it is a fact finder, not an expert witness, who ultimately determines reasonable use of force.

The State contends that it presented sufficient evidence to satisfy the "corrupt behavior" element of misconduct in office. According to the State, several sworn officers

16

testified that Petitioner used excessive force. The State also noted that Officer Pujols testified that Petitioner retroactively revised the police report to make the use of force appear more justified. According to the State, this evidence, coupled with the evidence of unreasonable use of force, satisfied the "corrupt behavior" element for misconduct in office.

The State asserts that despite the name of the "required evidence test", merger only occurs when the elements of two offenses are the same or if all of the elements of one offense are included in the other offense. The test is not necessarily satisfied, according to the State, simply when the same evidence is used to prove each offense. The State argues that the required evidence test was not satisfied in this case because misconduct in office requires an act by a public officer, which assault does not. Misconduct in office also requires corrupt intent, while battery requires a general intent. Finally, the State argues that the corrupt behavior element of misconduct in office may be satisfied by different types of behavior (*e.g.*, malfeasance, misfeasance, and nonfeasance), but does not contain alternative elements.

## DISCUSSION

### Standard of Review

Maryland Rule 8-131(c) provides the standard for appellate review of bench trials:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the [circuit] court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the [circuit] court to judge the credibility of the witnesses.

This Court has consistently recognized and applied this rule when reviewing the sufficiency of evidence in a bench trial. *State v. McGagh*, 472 Md. 168, 194, 244 A.3d 1117, 1132 (2021); *State v. Manion*, 442 Md. 419, 431, 112 A.3d 506, 513 (2015) ("when evaluating the sufficiency of the evidence in a non-jury trial, the judgment of the [circuit] court will not be set aside on the evidence unless clearly erroneous[.] We apply this standard 'to all criminal cases[.] . . .'") (quoting *State v. Smith*, 374 Md. 527, 534, 823 A.2d 664, 668 (2003)) (citation and quotation marks omitted).

Whether a conviction merges for sentencing purposes is a question of law that is assessed under a *de novo* standard of review. *Blickenstaff v. State*, 393 Md. 680, 683, 904 A.2d 443, 445 (2006). The failure to merge a conviction for sentencing purposes is reversible error, and as a matter of law, the sentence is illegal. *Clark v. State*, 246 Md. App. 123, 130, 227 A.3d 828, 832 (2020). Pursuant to Md. Rule 4-345(a), this Court "may correct an illegal sentence at any time."

**Analysis**

**A. There was sufficient evidence to support Petitioner's convictions for assault in the second degree and misconduct in office.**

"It is the responsibility of the appellate court, in assessing the sufficiency of the evidence to sustain a criminal conviction, to determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Manion*, 442 Md. at 430, 112 A.3d at 513 (quoting *Taylor v. State*, 346 Md. 452, 457, 697 A.2d 462, 464 (1997)) (emphasis in original) (citation omitted). This Court adopted this standard from

the United States Supreme Court case, *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). *McGagh*, 472 Md. at 194, 244 A.3d at 1132.

When reviewing the sufficiency of evidence, this Court does not retry the case. *Dawson v. State*, 329 Md. 275, 281, 619 A.2d 111, 114 (1993). "It is simply not the province of the appellate court to determine whether . . . [it] could have drawn other inferences from the evidence[.]" *Manion*, 442 Md. at 431, 112 A.3d at 513. "[O]ur concern is only whether the verdict was supported by sufficient evidence, direct or circumstantial, which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *Taylor v. State*, 346 Md. 452, 457, 697 A.2d 462, 465 (1997); *State v. Albrecht*, 336 Md. 475, 487, 649 A.2d 336, 341 (1994) ("[I]t is neither our duty nor our role to assess the credibility of the witnesses who testified nor to weigh the evidence presented. Rather, we shall only review that evidence which supported the State's case in order to determine whether *any* rational trier of fact could have convicted the defendant of the crimes charged.") (emphasis in original).

Because the circuit court is entrusted with making credibility determinations, resolving conflicting evidence, and drawing inferences from the evidence, *McGagh*, 472 Md. at 194, 244 A.3d at 1132, the reviewing court "gives deference to 'a trial judge's or a jury's ability to choose among differing inferences that might possibly be made from a factual situation[.]'" *Manion*, 442 Md. at 431, 112 A.3d at 513 (quotation omitted); *Smith v. State*, 415 Md. 174, 184–85, 999 A.2d 986, 992 (2010) (acknowledging that the circuit court, in a bench trial, is in the best position to resolve competing evidence and testimony).

19

This deference becomes more important in use of force cases given the "careful attention to the facts and circumstances" that must be paid by the circuit court when assessing whether use of force was reasonable. *County of Los Angeles, Calif. v. Mendez*, ___ U.S. ___, ___, 137 S. Ct. 1539, 1546 (2017) (quoting *Graham v. Conner*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989)); *see also Tierco Maryland, Inc. v. Williams*, 381 Md. 378, 428, 849 A.2d 504, 534–35 (2004) (Bell, C.J., dissenting) ("Having lived with the case, the trial judge views the situation in three dimension, up close and personal, not from a cold record; thus, having closely observed the entire trial, he or she is able to appreciate nuances, inflections and impressions never to be gained from a cold record[.]") (internal quotation omitted).

    1.  <u>Sufficient evidence of second-degree assault.</u>

Md. Code Ann., Criminal Law ("Crim. Law") § 3-203 proscribes second-degree assault, and Crim. Law § 3-201(b) provides that second-degree assault entails the "crimes of assault, battery, and assault and battery, which retain their judicially determined meanings." Petitioner struck Sgt. Middleton in the head and was convicted of assault "clearly of the battery variety," *Nicolas v. State*, 426 Md. 385, 403, 44 A.3d 396, 406 (2012), therefore we assess the sufficiency of evidence of second-degree assault of the battery variety.

The common law elements of assault in the second degree of the battery variety are (1) the unlawful, (2) application of force, (3) to the person of another. *See Snowden v. State*, 321 Md. 612, 617, 583 A.2d 1056, 1059 (1991) (distinguishing between common

20

law assault and battery). The parties only dispute whether there was legally sufficient evidence to satisfy the first element of unlawfulness.[10]

The lawfulness of use of force by a police officer is analyzed under the Fourth Amendment's objective reasonableness standard. *Graham*, 490 U.S. at 388, 109 S. Ct. at 1867–68 (holding claims of excessive force by law enforcement officials "in the course of making an arrest, investigatory stop, or other 'seizure' of [the] person . . . are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard. . . .").

"Because the test of reasonableness 'is not capable of precise definition or mechanical application,' its proper application 'requires careful attention to the facts and circumstances of each particular case.'" *Richardson v. McGriff*, 361 Md. 437, 452, 762 A.2d 48, 56 (2000) (quoting *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872) (other citation omitted). Factors for determining reasonable use of force include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he [or she] is actively resisting arrest." *Okwa v. Harper*, 360 Md. 161, 199, 757 A.2d 118, 139 (2000) (quoting *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872).

---

[10] As a subsidiary issue, the parties also dispute whether law enforcement justification is an element for assault or an affirmative defense. This Court has stated that "to be convicted of committing an intentional battery requires legally sufficient proof that the perpetrator intended to cause harmful or offensive contact against a person without that person's consent and *without legal justification*." *Elias v. State*, 339 Md. 169, 183–84, 661 A.2d 702, 709 (1995) (emphasis added); *Kellum v. State*, 223 Md. 80, 85, 162 A.2d 473, 476 (1960) (finding no evidence that an arrest was effectuated unlawfully). We need not address the nuance between "without legal justification" as an element and "law enforcement justification" as an affirmative defense because the State provided legally sufficient evidence that Petitioner's application of force was not justified.

21

The circuit court considered competing versions of events in determining whether Petitioner's use of force was reasonable under the circumstances. The State presented evidence in the form of witness testimony, video footage, and screen shots that demonstrated Sgt. Middleton acting non-aggressively before being punched in the face by Petitioner. Petitioner presented opposing testimony that Sgt. Middleton exhibited an aggressive posture and "assault[ed]" Petitioner by pushing him. Dr. Key, the only expert witness at trial, opined that based on the evidence presented at trial, particularly Petitioner's account, the strike to Sgt. Middleton's head was reasonable under the circumstances.

On balance, the circuit court found the State's evidence to be more credible and gave extra weight to security camera footage that corroborated the State's witnesses' recollection of events: "it's true, there were a lot of witnesses whom the Court chose not to believe. . . . I did see this incident from several perspectives and several different views. . . . But I will say that the evidence was truly sufficient and substantial and supports the verdict that was rendered."

The record supports the conclusion of the circuit court that the evidence, when viewed in the light most favorable to the State, was sufficient in establishing unreasonable use of force beyond a reasonable doubt. Petitioner arrived at the scene and immediately confronted Sgt. Middleton, who according to evidence from the State, was not acting aggressively. Sgt. Middleton exhibited neither force nor aggression preceding the confrontation with Petitioner. At most, Sgt. Middleton had her palms facing upward, and not "balled up" indicating imminent threat of force. According to evidence presented by the State, the overall environment was not as dangerous as characterized by Petitioner. The

22

scene became more chaotic only after Petitioner struck Sgt. Middleton, which some onlookers perceived as a gratuitous show of force by a male police officer against what appeared to be a laywoman. Sgt. Middleton was also 5'1" and approximately 130 pounds, which is relatively diminutive compared to Petitioner. The circumstances, when viewed in the light most favorable to the State, did not suggest that Sgt. Middleton posed an immediate threat to the health or safety of officers or others.

Petitioner gave Sgt. Middleton a verbal command to "get back" and pushed Sgt. Middleton with two hands. The circuit court suggested that this initial use of force was not unreasonable because there was a crowd of people, Petitioner issued a lawful order, and a two-handed push was not a harmful application of force. Petitioner's use of force became unreasonable when, following the push, he waited only a few seconds before striking Sgt. Middleton in the face "with a closed fist." There was little opportunity for Sgt. Middleton to comply with his verbal order to "get back." There was also little time for Petitioner to determine whether Sgt. Middleton would comply with the order. Between Petitioner's two-handed push and the strike to the face, there was no indication that greater use of force was necessary to bring Sgt. Middleton into compliance.[11]

---

[11] We note that while Policy 1115 was admitted as a defense exhibit, it highlights the unreasonable use of force under the circumstances.

> Members may be justified in using force at one moment, but not justified in using force several seconds later due to the changing dynamics of a situation. . . . Members shall continually assess the situation and changing circumstances, and modulate their use of force appropriately. . . . *When possible, members should "slow down" the situation and re-assess how they*

(continued . . .)

23

Petitioner contends that the State failed to present evidence to distinguish between lawful and unlawful use of force. We agree with the Court of Special Appeals that the State is not "required to present expert testimony on the reasonableness of an officer's use of force. . . . [T]he fact finder, not an expert witness, is the arbiter of the reasonableness of force used by a police officer to effect an arrest." *Koushall*, 249 Md. App. at 731, 246 A.3d at 772 (citation and quotations omitted). Even when the circuit court substantially relies on expert testimony, this Court has affirmed the role of the *factfinder* in the determination of reasonable use of force based on the totality of circumstances. *Estate of Blair by Blair v. Austin*, 469 Md. 1, 22–23, 228 A.3d 1094, 1106 (2020). Upon sufficiency of evidence review, we assess the facts adduced at trial, viewed most favorably to the State, to determine whether any reasonable *factfinder* could find the existence of elements beyond

---

(. . . continued)

> *can achieve the most peaceful outcome . . . the utmost restraint should be exercised.*

 (Emphasis added).

The circuit court reviewed Policy 1115 in making its determination, and concluded that "[Petitioner] overreacted to everything." The circuit court suggested there was an opportunity for Petitioner to have de-escalated with less use of force, but exhibited greater force than reasonably necessary:

> And the level of force, was it shocking? . . . Oh, I was shocked. Could he have grabbed her or something? . . . I do know he pulled back his fist, and there was no doubt that he meant to *not just get* that person under control, but it appeared that there was even . . . some intent *to do more than get* [*Sgt.*] *Middleton under control*.

(Emphasis added).

24

a reasonable doubt. The testimony of Dr. Key was just one factor for the circuit court to consider in reaching its ultimate determination.[12]

It is conceivable that this Court sitting in the first instance may have placed greater emphasis on the opinion of Dr. Key, who was a 37-year veteran of the BCPD and helped literally write the book on BCPD use of force training. Under sufficiency of evidence review, we do not substitute our judgment of the weight of evidence for the judgment of the circuit court. "Fundamentally, our concern is not with whether the [circuit] court's verdict is in accord with *what appears to us to be the weight of evidence*, but rather is only with whether the verdicts were supported with sufficient evidence. . . ." *State v. Albrecht*, 336 Md. 475, 478–79, 649 A.2d 336, 339 (1994) (citations omitted) (emphasis added). "This is not, as [Petitioner] suggests, a case in which a police officer has been held criminally liable for conduct that was without a doubt [lawful]. . . . Rather, we find the record replete with evidence from which the [circuit] court could have concluded that [Petitioner]" acted objectively unreasonably under the circumstances. *Id.* at 502–03, 649 A.2d at 349. We hold there was sufficient evidence to convict Petitioner of second-degree assault.

2. Sufficient evidence of misconduct in office.

The preceding analysis also leads to the same conclusion that there was sufficient evidence to sustain the conviction for misconduct in office. "The prohibition of

---

[12] Dr. Key based his opinion on testimony depicting Sgt. Middleton as the aggressor that the circuit court did not find credible. It follows that the circuit court would not ascribe as much weight to Dr. Key's testimony as Petitioner.

misconduct by police officers serves an important government interest. . . . Since peace officers are charged with a public trust, the public has every right to expect these officers to conduct themselves with good character, sobriety, judgment and discretion." McQuillin, *The Law of Municipal Corporations*, 16A McQuillin Mun. Corp. § 45:125 (3d ed. Sept. 2021) (footnoted omitted).

"In Maryland, misconduct in office is a common law misdemeanor." *Duncan v. State*, 282 Md. 385, 387, 384 A.2d 456, 458 (1978) (footnote omitted). The elements of misconduct in office are "[1] corrupt behavior[, 2] by a public officer[, 3] in the exercise of his [or her] office or while acting under color of his or [her] office." *Id.*, 384 A.2d at 458 (citing Perkins on Criminal Law 485 (2d ed. 1969)). There is no dispute that Petitioner was a public officer at the time of the incident and was exercising the duties of his office. The dispositive issue in the case at bar is whether there was legally sufficient evidence to satisfy the first element of corrupt behavior.

"The corrupt behavior may be (1) the doing of an act which is wrongful in itself – malfeasance[;] or, (2) the doing of an act otherwise lawful in a wrongful manner – misfeasance; or, (3) the omitting to do an act which is required by the duties of the office – nonfeasance." *Id.*, 384 A.2d at 458 (citing *State v. Carter*, 200 Md. 255, 262–267, 89 A.2d 586, 589–91 (1952)).

Malfeasance, misfeasance, or nonfeasance are not alternative elements because these terms, standing alone, do not "create[] a separate offense for each alternative. . . ." *Twigg*, 447 Md. at 14, 133 A.3d at 1133 (citation omitted). These terms describe three types of acts or omissions that may satisfy the unitary element of corrupt behavior. *Duncan*,

26

282 Md. at 387 n.2, 394 A.2d at 458 n.2 ("'The cases in this [C]ourt do not always call misconduct in office by either one of the two terms, malfeasance or misfeasance, but when they do use the words, they seem to recognize the distinction.' The same observation applies to nonfeasance.") (citation omitted). We rejected the contention that misconduct in office consists of separate offenses in *Carter:*

> [I]t is not particularly important what [misconduct in office] is called. The indictment, of course, charges that these defendants did something which they ought not to have done . . . and they are charged with performing this duty corruptly and improperly. Whether this is called malfeasance, or misfeasance or nonfeasance, it is a *clear charge of misconduct in office. . . . There are not two or three separate crimes charged in the indictment. There is only one crime. . . .*

200 Md. at 267, 89 A.2d at 591 (emphasis added).

In the instant case, the same evidence that established unlawful use of force for the second-degree assault conviction also satisfied the corrupt behavior element. *See Riley v. State*, 227 Md. App. 249, 264 n.7, 133 A.3d 1219, 1228 n.7 (2016) ("the assault became an act 'by a public officer in the exercise of the duties of his office' which was 'corrupt,' and that assault constituted an 'oppressive and willful abuse of authority.'") (citation omitted). As explained above, there was sufficient evidence that Petitioner used unreasonable force under the circumstances, which constituted second-degree assault. A member of law enforcement who commits a crime in the course of duty may satisfy "the corrupt act [element] constituting the crime of misconduct in office. . . ." *Duncan*, 282 Md. at 391, 384 A.2d at 460; *Hitzelberger v. State*, 174 Md. 152, 163, 197 A. 605, 610 (1938) (affirming a misconduct in office conviction of a police officer that protected the operation of prostitution within Baltimore City).

27

Besides evidence of assault, the State presented additional evidence to satisfy the "corrupt behavior" element of misconduct in office. There was testimony that Petitioner failed to follow BCPD policies with respect to his body camera and de-escalation. Detective Wiggins testified that Petitioner acted as if he had a "vendetta" against Sgt. Middleton. The circuit court credited this statement and found that Petitioner "had some intent to do more than get [Sgt.] Middleton under control." Most significantly, Officer Pujols testified that Petitioner instructed him to change his police report to make Sgt. Middleton seem like the aggressor and Petitioner's use of force appear more reasonable. When viewed in the light most favorable to the State, there was sufficient evidence that Petitioner's conduct, in both effectuating the arrest and attempting to conceal the circumstances of the arrest, satisfied the "corrupt behavior" element of misconduct in office.

We conclude that there was sufficient evidence to convince a rational trier of fact that Petitioner was guilty of second-degree assault and misconduct in office beyond a reasonable doubt.

**B. Second-degree assault did not merge with misconduct in office for sentencing purposes.**

Maryland recognizes three grounds for merging a defendant's convictions for sentencing purposes: "(1) the required evidence test; (2) the rule of lenity; and (3) the principle of fundamental fairness." *Carroll v. State*, 428 Md. 679, 694, 53 A.3d 1159, 1167 (2012). None of these grounds apply; therefore, the convictions do not merge.

28

1.  The required evidence test.

The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution, applicable to the States through the Fourteenth Amendment, prohibits "multiple punishment upon a single conviction for the same offense . . . ." *Newton v. State*, 280 Md. 260, 264, 373 A.2d 262, 264 (1977). "Even though the Maryland Constitution has no express double jeopardy provision, there is protection against it under Maryland common law." *Ware v. State*, 360 Md. 650, 708, 759 A.2d 764, 795 (2000); *Middleton v. State*, 318 Md. 749, 757, 569 A.2d 1276, 1279 (1990) ("Another, distinct, double jeopardy principle [pursuant to Maryland common law] is that multiple sentences for the same offense are ordinarily precluded."). "Thus, under both federal double jeopardy principles and Maryland merger law, the test for determining the identity of offenses is the required evidence test." *Newton*, 280 Md. at 268, 373 A.2d at 266.

"The required evidence test focuses on the elements of each crime in an effort to determine whether all the elements of one crime are *necessarily* in evidence to support a finding of the other, such that the first subsumed as a lesser included offense of the second." *Monoker v. State,* 321 Md. 214, 220, 582 A.2d 525, 527 (1990) (emphasis added). "If each offense requires proof of a fact which the other does not, the offenses are not the same and do not merge. However, if only one offense requires proof of a fact which the other does not, the offenses are deemed the same, and separate sentences for each offense are prohibited." *Newton*, 290 Md. at 268, 373 A.2d at 266.

This Court held in *Middleton* that convictions for first-degree rape and second-degree rape merged for sentencing purposes because "only one offense, first[-]degree rape,

29

required proof of an additional fact [*i.e.,* an aggravating factor], so that all the elements of second[-]degree rape were present in first[-]degree rape." 318 Md. at 758, 569 A.2d at 1280.

In *Monoker*, this Court determined that solicitation and conspiracy did not pass the required evidence test because all of the elements of the "lesser crime" of solicitation are not included in the "greater crime" of conspiracy. 321 Md. at 222, 582 A.2d at 528. Solicitation requires "counselling, enticing or inducing another to commit a crime." *Id.* at 220, 582 A.2d at 528 (citation omitted). Conspiracy requires an agreement between two or more people to accomplish an unlawful purpose or a lawful purpose by unlawful means. *Id.* at 221, 582 A.2d at 528 (noting in Maryland "no overt act in furtherance of the agreement is necessary" to form a conspiracy).

The defendant in *Monoker* induced a confederate to burglarize the victim. *Id.*, 582 A.2d at 528. By inducing the confederate, the defendant also formed an agreement to commit a burglary. These two crimes did not merge under the required evidence test because one does not need to induce another to form a conspiracy. A conspiracy may emerge through mutual agreement, whereas solicitation requires one party to actively persuade another to commit a crime. *Id.*, 582 A.2d at 528. While the same, underlying conduct may have constituted two different crimes,[13] this Court held that the two sentences

---

[13] Both this Court and the United States Supreme Court have rejected the "actual evidence test[]" which merges convictions "if the evidence actually produced at trial on both offenses is substantially the same." *Newton*, 280 Md. at 271, 373 A.2d at 268 (citation omitted). It is for this reason that Petitioner's citation of *State v. Lore*, 197 N.J.Super. 277,

(continued . . .)

30

did not merge under the required evidence test. *Id.* at 222, 582 A.2d at 528–29 ("Since it is not impossible to commit the greater crime without also having committed the lesser, as is necessary under the required evidence test . . . the two offenses cannot necessarily be deemed the 'same' under that test.").

Similar to the crimes of solicitation and conspiracy in *Monoker*, second-degree assault and misconduct in office do not merge because the unlawful use of force needed to establish second-degree assault is *not necessary* to establish misconduct in office. The corrupt act element of misconduct in office may be satisfied by a range of acts or omissions. Assault does not require proof of a public official performing or failing to perform a duty under the color of office. The Court of Special Appeals correctly observed that "[e]ach

---

(. . . continued)

484 A.2d 1259 (1984), is misplaced. In *Lore*, the New Jersey Superior Court held that simple assault must merge with official misconduct in office because the "two offenses occurred at the same time and place[,and t]he State relied upon the simple assault to establish the official misconduct in office—that defendant injured Molowitz while arresting him." *Id.* at 283–84, 484 A.2d at 1263. The New Jersey Superior reached this result because New Jersey does not apply the required evidence test as found in Maryland common law:

> Instead, [New Jersey] uses . . . a certain flexibility of approach . . . attended by considerations of 'fairness[.]' . . . Such an approach would entail analysis of the evidence in terms of, among other things, the time and place of each purported violation; whether the proof submitted as to one count of the indictment would be a necessary ingredient to a conviction under another count. . . . Certainly there are other factors to be considered and . . . accorded greater or lesser weight depending on the circumstances of the particular case.

*State v. Mirault*, 92 N.J. 492, 501–02, 457 A.2d 455, 460 (1983) (citation and footnote omitted).

31

crime thus contains an element that the other does not[,]" *Koushall*, 249 Md. App. at 734, 246 A.3d at 774, and therefore the crimes do not merge under the required evidence test.

Petitioner argues that misconduct in office is analogous to a "multi-purpose criminal statute" in which this Court "refine[s the required evidence test] by looking at the alternate elements relevant to the case at hand." *Middleton*, 318 Md. at 758, 569 A.2d at 1280 (quoting *Nightingale v. State*, 312 Md. 699, 705, 542 A.2d 373, 376 (1988)). A multi-purpose statute "may be treated as separate statutory offenses for double jeopardy purposes[]" because "it proscribes several different types of conduct[]"). *Nightingale*, 312 Md. at 706, 542 A.2d at 376. "When . . . a multi-purpose statute is involved," this Court "must construct from the alternative elements within the statute the particular formulation that applies to the case at hand. It should rid the statute of alternative elements that do not apply. It must, in other words, treat a multi-purpose statute written in the alternative as it would treat separate statutes." *Id.* at 706–07, 542 A.2d at 376 (quoting *Pandelli v. United States*, 635 F.2d 533, 537 (6th Cir. 1980)).

Common law offenses may constitute a "multi-purpose crime." *State v. Ferrell*, 313 Md. 291, 298, 545 A.2d 653, 656 (1988) ("when a common law offense . . . embrac[es] different matters in the disjunctive, a court in applying the required evidence test must examine 'the alternative elements relevant to the case at hand.'") (citations omitted). In *Snowden v. State*, we concluded that "[r]obbery is a compound larceny[]" because it may be "accomplished by either an assault (putting in fear) or a battery (violence)." 321 Md. at 618, 583 A.2d at 1059. Alternative element analysis for merger only applies when the statutory or common law crime provides discrete, disjunctive elements. *Newton*, 280 Md.

32

at 272, 373 A.2d at 268 ("The underlying felony is one of two alternative elements of the crime."); *Thomas v. State*, 277 Md. 257, 269, 353 A.2d 240, 247–48 (1976) ("But it should be noted that the provisions of [the statute] are in the disjunctive.").

We are not persuaded by Petitioner's argument that the various modalities (*e.g., malfeasance, misfeasance, and nonfeasance*) are alternative elements for the common law crime of misconduct in office. Maryland common law treats misconduct in office as a "singular offense[.]" *Sewell v. State*, 239 Md. App. 571, 601, 197 A.3d 607, 625 (2018) (citing *Carter*, 200 Md. at 262–63, 89 A.2d at 589); *cf. Nightingale*, 312 Md. at 706, 542 A.2d at 376 (explaining that multi-purpose crimes are analyzed as *separate* offenses). While there may be different modalities of corrupt behavior, we are not aware of any Maryland authority that has treated these modalities as disjunctive and alternative elements for the crime of misconduct in office. [14]

The three behavioral modalities commonly associated with misconduct in office, malfeasance, misfeasance, and nonfeasance, are three of many different terms used to define the broad element of "corrupt behavior." It is no surprise that "many substitutes [for

---

[14] As further illustration, we note that the Maryland Pattern Jury Instructions omit alternative elements for misconduct in office. MPJI-CR 4:23 (2021). While not binding on this Court, the Pattern Jury Instructions seek "to make [jury] instructions as accurate statements of the law as possible[.] . . ." MPJI-CR intro. (2021). When this Court recognizes alternative elements of a crime, the Pattern Jury Instructions generally place these alternative elements in brackets. MPJI-CR intro. (2021). For example, this Court in *Twigg v. State*, 447 Md. 1, 13, 133 A.3d 1125, 1133 (2016), recognized that the child abuse statute has alternative elements. Accordingly, the Pattern Jury Instruction for the crime of child sexual abuse lists the alternative elements in brackets: "that the defendant sexually abused (name) by acts or attempted acts including [rape] [incest] [sodomy] [other sexual offense] [unnatural or perverted sexual practices] [sexual exploitation] [sexual molestation][.]" MPJI-CR 4:07.2 (2021).

misconduct in office] have been used, such as, official misconduct, misbehavior in office, malconduct in office, malpractice in office, misdemeanor in office, and corruption in office." *Duncan*, 282 Md. at 387 n.1, 384 A.2d at 458 n.1 (citing Perkins on Criminal Law 485 (2d ed. 1969)). While there are numerous acts or omissions that constitute "corrupt behavior", there is no alternative element that may satisfy the common law crime of misconduct in office. The required evidence test does not apply.

2. <u>The rule of lenity.</u>

"If . . . the required evidence test is not fulfilled . . . we move to a separate inquiry: whether the principle of statutory construction known as the rule of lenity requires merger." *Khalifa v. State*, 382 Md. 400, 433, 855 A.2d 1175, 1194 (2004); *State v. Lancaster*, 332 Md. 385, 394, 631 A.2d 453, 458 (1993) ("Although the required evidence test is the normal standard under Maryland law for determining merger of offenses, it is not the exclusive standard.").

"As it is a principle of statutory construction, the rule of lenity applies where both offenses are statutory in nature or where one offense is statutory and the other is a derivative of common law." *Khalifa*, 382 Md. at 434, 855 A.2d at 1194. "[I]f we are unsure of the legislative intent in punishing offenses as a single merged crime or as distinct offenses, we, in effect, give the defendant the benefit of the doubt and hold that the crimes do merge." *Monoker*, 321 Md. at 222, 582 A.2d at 529; *Jones v. State*, 357 Md. 141, 156, 742 A.2d 493, 501 (1999) ("Under the Double Jeopardy Clause, a defendant is protected against multiple punishment for the same conduct, unless the [General Assembly] clearly intended to impose multiple punishments.").

Petitioner did not raise the rule of lenity as a basis for merger before the sentencing court. The Court of Special Appeals suggested in a footnote that the rule of lenity would not have applied because "[s]econd-degree assault and misconduct in office are both common law crimes." *Koushall*, 249 Md. App. at 733 n.5, 246 A.3d at 774 n.5.

We reach the issue of the rule of lenity to forestall any future collateral proceedings because the failure to merge a sentence when mandated by the General Assembly is considered "illegal" pursuant Md. Rule 4-345.[15] *Chaney v. State*, 397 Md. 460, 466, 918 A.2d 506, 509 (2007) (noting that collateral and belated review under Md. Rule 4-345(a) is permitted for illegal sentences). "When a sentencing judge imposes multiple sentences where it is established, as a matter of law, that the [General Assembly] intended that multiple sentences not be imposed, that legislatively prohibited sentence is also an 'illegal sentence' within the contemplation of [Md.] Rule 4-345(a)." *Pair v. State*, 202 Md. App. 617, 625, 33 A.3d 1024, 1028 (2011).

Despite retaining its "judicially determined meaning[,]" this Court has held that second-degree assault is a statutory crime.

> We have determined, however, that the [assault] statutes as adopted represent the entire subject matter of the law of assault and battery in Maryland, and as such, *abrogate the common law on the subject*. The 1996 statutes are more than mere penalty provisions for the common law offenses of assault and battery. They created degrees of assault unknown to the common law, and *while retaining the common law elements of the offenses of assault and*

---

[15] Ordinarily, this Court does not decide an issue that was not raised in the petition for *certiorari* or any cross-petition. Md. Rule 8-131(b). On select occasions, this Court has, "in the interests of judicial economy and expedition, deemed it appropriate to decide such an issue[.]" *Matthews v. Amberwood Associates Ltd.*, 351 Md. 544, 581, 719 A.2d 119, 137 (1998) (citation omitted).

*battery and their judicially determined meanings, the statutes repealed the statutory aggravated assaults and created new offenses.*

*Robinson v. State*, 353 Md. 683, 694, 728 A.2d 698, 703 (1999) (emphasis added). Because misconduct in office is a common law crime and second-degree assault is a statutory crime, the rule of lenity is worthy of consideration.

Despite the potential application of the rule of lenity, a review of the comprehensive statutory scheme of the assault statute demonstrates that the General Assembly did not intend for second-degree assault to merge with misconduct in office for sentencing purposes. The overall purpose of the statute was to "reorganize[] all laws dealing with assault into one coherent statutory scheme." *Id.* at 698, 728 A.2d at 705 (emphasis added). This Court reviewed the legislative history of the statute and concluded "that the General Assembly clearly intended the statutes to encompass the entire subject of assault and battery and to abrogate the common law on the subject." *Id.* at 698–99, 728 A.2d at 705. The common law crime of misconduct in office is understandably excluded from the plain text of the statute and its legislative history because it was not relevant to the objective of the General Assembly in revising "the State's laws on crimes related to physical injury and attempted physical injury." H.B. 749, Floor Report, 1996 Leg., 410th Sess. (Md. 1996).

We conclude that the rule of lenity does not warrant merging the sentences of second-degree assault and misconduct in office.

3. Fundamental Fairness.

Finally, this Court may consider whether fundamental fairness warrants merging two sentences that would not otherwise be merged under the required evidence test and

36

rule of lenity. The Court of Special Appeals declined to address fundamental fairness because Petitioner did not preserve the argument on appeal. *Koushall*, 249 Md App. at 737, 246 A.3d at 776. Unlike the required evidence test or the rule of lenity, the Court of Special Appeals stated that "fundamental fairness does not 'enjoy[] the procedural dispensation of [Md.] Rule 4-345(a)[,]'" *id.* at 737, 246 A.3d at 776 (footnote and citation omitted), because "fundamental fairness is not an inherently illegal sentence within the tightly limited contemplation of the rule." *Id.* at 737 n.6, 246 A.3d at 776 n.6 (quotation marks and citation omitted).

Petitioner did not raise fundamental fairness as grounds for merger before this Court. We agree with the Court of Special Appeals that failure to merge a sentence based on fundamental fairness does not render the sentence illegal. *State v. Wilkins*, 393 Md. 269, 273–74, 900 A.2d 765, 768 (2006) ("a motion to correct an illegal sentence can be granted only where there is some illegality in the sentence itself or where no sentence should have been imposed."). Fundamental fairness does not merge sentences because of any inherent flaw in the sentences; rather, it is a "fact-driven" inquiry that considers whether a defendant should not receive separate, but otherwise legal, criminal punishments under the circumstances. *Carroll v. State*, 428 Md. 679, 695, 53 A.3d 1159, 1168 (2012).

Without the possibility of collateral attack of the sentence on grounds of fundamental fairness, we decline to address the issue here. We hold the convictions of second-degree assault and misconduct in office do not merge for sentencing purposes.

**C**ONCLUSION

For the reasons previously explained, we affirm the judgment of the Court of Special

Appeals.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**